HORACE F. CLARK, Appellant, *v.* THE NEW YORK LIFE INSURANCE AND TRUST COMPANY, Trustee, &c., and others, Respondents.

(GENERAL TERM, FIRST DEPARTMENT, JUNE, 1873.)

The purpose of a written agreement is to record, with precision, the mutual understanding of the parties. When the terms of it are free from ambiguity, everything *dehors* the writing is excluded, and all matters of negotiation and discussion on the subject are merged in the instrument.

Unless there be such an ambiguity in the terms of the contract as to require extrinsic evidence to remove or explain it, such evidence is inadmissible, or, if admitted, does not control the construction of the agreement,

Accordingly, where an agreement recited that the contracting parties were, respectively, owners of lots on the northerly and southerly sides of Twenty-second street, between Fourth avenue and Broadway, and made certain agreements respecting "the lots *fronting* said street,"—*Held*, the plain intent of the parties was to include in the agreement all their property on Twenty-second street, between Broadway and Fourth avenue; and that a map shown to have been before the parties at the execution of the agreement, upon which certain of the lots lying on the corner of Broadway and Fourth avenue were laid down as *fronting* on Broadway, could not control or interfere with this intention.

THE action was brought to obtain an injunction restraining the defendants from building to the street line on the southeast corner of Broadway and Twenty-second street, in the city of New York.

The appeal was taken by the plaintiff from that portion of the decree which denied the relief as to certain of the premises. The facts appear in the opinion.

*W. A. Beach*, for the appellant

*Joseph J. Marrin*, and *Wm. Henry Arnoux*, for the respondents.

Present—FANCHER and DAVIS, JJ.

FANCHER, J. On the 12th day of May, 1849, Philip Kearney was the owner of the premises on the northerly side of

Twenty-second street, between Broadway and the Fourth avenue, in the city of New York; and Alexander S. Macomb and wife were the owners of the premises on the southerly side of that street, between Broadway and the Fourth avenue. Being such owners they, on said day, entered into a mutual agreement, under their hands and seals, a copy of which is annexed to the complaint, and upon the construction of which the rights of the parties to this action depend. The agreement was duly acknowledged and recorded, and contains covenants running with the land.

At the time of the agreement several dwelling-houses had been erected on either side of the street, which had been set back seven feet and six inches from the line of the street; thus leaving a space of that extent between the houses and the street. The agreement recites the fact of the ownership of the lots, as already mentioned, the fact of the erection of said houses, and that the parties thereto deemed it to be for their mutual advantage that the lots fronting said street when built upon, between the said Fourth avenue and Broadway, should be occupied exclusively by dwelling-houses; and that the fronts of all such dwelling-houses should be placed back seven feet and six inches from the line of the street, so as to range with those already built, and that no nuisance should be permitted on said lots between the Fourth avenue and Broadway. The parties then, by said agreement, did, for themselves and their respective heirs and assigns, grant and agree to and with each other that so much of their said respective lots as is contained between the line of the street and a line seven feet and six inches therefrom, should forever thereafter remain and be enjoyed as a court-yard in front of any houses to be erected on said lots; and that the parties should not, nor should their heirs or assigns, erect or permit to be erected or carried on, upon any part of the respective lots, any of the nuisances particularly specified in the agreement.

It is contended by the plaintiff, who owns one of the lots on the southerly side of the street, about 121 feet easterly

from Broadway, that the covenant respects the entire strip of land seven and a half feet wide, extending from Broadway to the Fourth avenue ; and the defendants contend that the covenant does not respect so much of said strip of land as does not now lie in front of the lots on Twenty-second street ; and, therefore, that the portion of said strip which is part of the lot on Broadway is not affected by the agreement.

The learned judge before whom the action was tried at Special Term decided that the contract did not apply to the lot fronting on Broadway. He said : " Had not the original agreement been confined in its terms to lots fronting on Twenty-second street it might well be claimed that the intent of the parties was to extend the line as reserved thereby to Broadway ; but as the terms are express, and exclude all lots but those fronting on the street, I do not see any ground upon which the corner lot can be included within its provisions."

This reasoning of the learned judge is forcible, if it be not founded upon a mistake of fact. He assumes that at the time the agreement was made there was a division of the premises, so that there were lots on the street and a corner lot fronting on Broadway. Indeed, the learned judge says : " It cannot be claimed that the intent of the parties was that no buildings should be erected on this land fronting on Broadway *unless it could be shown that the lots in question were laid out as fronting on that street*. No proof of such a character has been given. On the contrary, the premises at the time were occupied with old buildings having their front on Broadway, and have so remained. The lots were so laid out, and were so described on the map before referred to, and in the lease executed in 1854. The lot on the corner cannot be brought under the terms of this agreement except by altering the division of the lots to the destruction of the buildings there existing thereon."

Surely, the learned judge fell into a serious error as to a matter of fact. When the agreement which has been referred to was executed there was no division of the land so that

there was a corner fronting on Broadway any more than it fronted on Twenty-second street, and there was then no building there. There was only a vacant plot of ground. It fronted both on Broadway and on Twenty-second street, about as much on one as the other. The agreement was made in May, 1849. And it was proved on the trial that when the plaintiff purchased his lot fronting on Twenty-second street, in 1852, the whole of the ground westerly from his house, and between it and Broadway, "was a lawn inclosed by a picket fence, and not subdivided. It was inclosed southerly by the middle of the block or by Twenty-first street. There was no house or building between the plaintiff's house and Broadway, then called Bloomingdale road. The whole space was inclosed in a picket railing, and in a lawn or very handsome grass plat." No buildings were erected on Broadway, on that ground, until 1854. One of the parties to the agreement, Alexander S. Macomb, was examined as a witness on the trial. He was asked, "Q. How did the land stand at that time? A. There was a straight line running from Broadway to Fourth avenue; we made an agreement to set back the line fronting on Twenty-second street seven feet and a half;" "the lots were not inclosed; we made the street ourselves, cut the street through, built the sewers, and laid out the street, and after laying out that street we made an agreement." "Q. How was the corner lot occupied at that time; was it inclosed, and if so, how? A. When the street was cut through, and about the time we made the agreement, I am not sure whether it was inclosed or not; I can't tell; I think it was a high bank, and we dug it down;" "if it was inclosed, the fence covered the whole lot; it covered the whole of the lot on Broadway 102 feet, and about 100 feet on Twenty-second street up to the line of the street."

This testimony makes it clear that at the time of the agreement there was no building on the land westerly from the plaintiff's house and lot, and that the premises bounded on one side by Broadway and on another side by Twenty-second

street were not divided by any visible lines, but constituted one plat, nearly square, of vacant ground.

Whether the agreement was made with reference to any map of the *locus in quo*, except a map showing straight lines from Broadway to Fourth avenue, is not very clear. Macomb, one of the parties to the agreement, was questioned on that point and answered as follows: "Q. How were the lots divided up at the time this agreement was made? * * * Q. How did the land stand at that time? A. *There was a straight line running from Broadway to Fourth avenue; we made an agreement to set back the line fronting on Twenty-second street seven feet and a half.*" This witness says that when the agreement was made the parties had "the maps" before them. The court has annexed a diagram to the findings, which, perhaps, represents the maps; but as to this fact the evidence is very obscure and scarcely sufficient to support the finding.

But, admitting there was such a map before the parties at the execution of the agreement, what influence can that fact have on the interpretation of the agreement? The agreement speaks for itself. If it accord with the maps, well; but if it differ from the maps, they are not to control, but the agreement must control. The agreement is capable of interpretation by its own terms. The purpose of an agreement is to record, with precision, the mutual understanding of the parties. When the terms of it are free from ambiguity, everything *dehors* the writing is excluded, and all matters of negotiation and discussion on the subject are merged in the instrument. (*Kain* v. *Olds*, 2 Barn. & Cress., 627; *Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch., 273; *Dean* v. *Mason*, 4 Conn., 428.) Moreover, it is a well settled rule, and one that is acknowledged in all the cases on the subject, that parol evidence is inadmissible to supply or contradict, enlarge or vary the words of a written instrument. The reason assigned is, that to allow a contract in writing to be enlarged or varied by oral testimony would be to substitute parol for written evidence under the hand of the party, and it would lead to

uncertainty, error and fraud. (*Piersons* v. *Hooker*, 3 Johns., 68 ; *Jackson* v. *Foster*, 12 id., 488.) Unless there be such an ambiguity in the terms of the contract as to require the application of extrinsic evidence to remove or explain it, the extrinsic evidence is wholly inadmissible.

Now, there is nothing obscure or ambiguous in the contract in question. It is plain and perspicuous. Its intent and effect are apparent. If there be no preconceived theory to which it is attempted to make it bend, the mutual intention of the parties to the instrument, when they executed it, cannot be a difficult subject of inquiry. In the first place, it recites that the parties are severally owners " of divers lots of land," one of them of lots on the northerly side, and the other of them of lots on the southerly side " of Twenty-second street, between the Fourth avenue and Broadway." Confessedly, this recital intends to cover all the land on both sides of Twenty-second street from the Fourth avenue to Broadway. It includes, beyond question, what is now called the Broadway lots.

After such recital, the agreement proceeds as follows : " And whereas, divers dwelling-houses of brick or stone have been erected on each side of said street, which have been set back seven feet and six inches from the line of the street, thus leaving a court-yard in front of said houses seven feet and six inches between the said houses and the line of the street; and the parties hereto deeming it to be for their mutual advantage that *the lots fronting said street when built upon between the said Fourth avenue and Broadway should be occupied exclusively by dwelling-houses, and that the fronts of all such* dwelling-houses should be placed back seven feet and six inches from the line of the street, so as to range with those already built of brick or stone, and that no nuisance should be permitted on *said lots between the Fourth avenue and Broadway aforesaid,* do, for themselves and their respective heirs and assigns, grant and agree to and with each other that *so much of their said respective lots* belonging to them respectively as is contained between the line of

the street and a line seven feet and six inches therefrom shall forever hereafter remain and be enjoyed as a court-yard in front of any *houses to·be erected on said lots;* and the parties, for themselves and their respective heirs and assigns, mutually consent and agree to and with each other that neither they nor their respective heirs or assigns shall or will erect or carry on, or permit to be erected or carried on, upon *any part of the respective lots,* any slaughter-house, smith's shop, furnace, steam engine, brass foundry, nail or other iron factory, or any manufacturing of gunpowder, glue, varnish, vitriol, ink or turpentine, or for the tanning, dressing or preparing skins, hides or leather, or any brewery, distillery or any other noxious or dangerous trade or business; and also that in case they respectively do or shall at any time hereafter convey *any or either of the said lots of land to them respectively belonging as aforesaid, that there shall be inserted in the deed or deeds* of conveyance *thereof,* to be executed by the grantee or grantees therein, proper covenants *in relation to the lot or lots thereby conveyed, binding such grantee or grantees,* his or their heirs and assigns, specifically and *particularly to observe, perform and keep all and every of the conditions, covenants and provisions contained in this agreement relating to the said lot or lots."*

When the parties recited their respective ownerships of the lots, they described them as "lots of land on the northerly side of Twenty-second street, between the said Fourth avenue and Broadway;" and as "lots of land on the southerly side of Twenty-second street, between the said Fourth avenue and Broadway." There was no exclusion of any lots on Broadway. The whole land lying between Fourth avenue and Broadway was included; and it was spoken of as lots on the southerly side and on the northerly side of Twenty-second street, between Fourth avenue and Broadway. In the next recital the parties state that they deemed it to be for their mutual advantage that the lots fronting said street, when built upon, between the said Fourth avenue and Broadway, should be occupied exclusively by dwelling-houses; and that

the fronts should be placed back seven feet and six inches from the line of the street, so as to range with those already built, and that no nuisance should be permitted on said lots between the Fourth avenue and Broadway aforesaid. Can any one doubt that this recital includes all the lots between Fourth avenue and Broadway? It is very clear that it does include all the lots, and that none are excepted. The recital shows that the parties contemplated the erection of dwelling-houses only on the premises, and had in view the fronting of all of them on Twenty-second street. This is made more apparent by the expression "that no nuisance should be permitted on said lots between the Fourth avenue and Broadway aforesaid." It will scarcely be contended that such expression does not include the whole land, on either side of Twenty-second street, between Fourth avenue and Broadway; and if so much be conceded, it follows that the same lots which are thus restricted against nuisances are those on which the buildings are to recede seven feet and six inches, "so as to range with those already built."

The parties, in the recitals of the agreement, had thus referred to their land as *lots on Twenty-second street;* and when the operative words of the agreement begin, the language is equally explicit. They " do, for themselves and their respective heirs and assigns, grant and agree to and with each other that so much of their *said respective lots,* belonging to them respectively, as is contained between the line of the street and a line seven feet and six inches therefrom shall forever remain and be enjoyed as a court-yard in front of any houses to be erected on *said lots ;*" and neither the parties nor their heirs or assigns shall erect or permit any nuisance "upon *any part of the respective lots.*" They further covenanted that when either of them thereafter should convey " *any or either of the said lots of land,* to them respectively belonging as aforesaid," there should be inserted in the deeds of conveyance thereof proper covenants binding the grantees, their heirs and assigns, "specifically and particularly to observe, perform and keep all and every of the

conditions, covenants and provisions contained in that agreement relating to *the said lots*." There is no exception here of lots on Broadway; nor any language from which such an exception can be implied. By express terms all the lots are defined as fronting on Twenty-second street; and when any conveyance of any or either of the lots should be made, covenants against the nuisances, and requiring the buildings to be set back seven feet and six inches from the line of Twenty-second street, were required to be inserted in the conveyance.

Two things are obvious on reading the agreement. The first is that the parties to it contemplated an apparent widening of Twenty-second street from the Fourth avenue to Broadway; and the next is that the parties referred to their land on either side of the street as lots fronting on Twenty-second street. The boundary on the Fourth avenue and on Broadway was made subsidiary to the purpose of the parties, as evinced by the agreement, which was to create a court-yard space on either side of the street from Fourth avenue to Broadway, and to restrict the lots against nuisances. The owners of the land had certainly a right to make the same subject to the agreement; and no good reason for abrogating or modifying the agreement can be found in the fact that the land on Broadway has become more valuable for business purposes than was anticipated when the agreement was made.

It is said that the corner lot on Broadway will be mutilated and lessened in value if the construction of the agreement be such as to include that lot. The answer is obvious. The agreement was not made with reference to the benefit to the corner lot alone, but with reference to the benefit to all the lots on Twenty-second street between the Fourth avenue and Broadway. Another suggestion, made by counsel on the argument, was that if the parties had intended to include the Broadway lots in the agreement it was easy to have done so by express and unequivocal language. It may be answered, the description employed by the parties clearly does embrace

the Broadway lots, as they are now called; and if the parties had intended not to include them in the terms of the agreement, it was not only easy but necessary for them to except those lots from the operation of the agreement. This they did not do; and, by fair interpretation, they must be held to be within the agreement.

The judgment of the Special Term should be modified by extending the injunction to all the land on the southerly side of Twenty-second street, westerly of the lot owned by the plaintiff, and between that lot and Broadway, with costs to the plaintiff.

Judgment accordingly.